**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| ALEX HOLLERAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Cause No.: 1:05-CV-36 |
| | ) |
| OMNIFLIGHT HELICOPTERS, INC., | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OF OPINION AND ORDER**

This matter is before the court on the motion for summary judgment filed by the

Defendant, Omniflight Helicopters, Inc. (hereinafter "Omniflight") on October 31, 2005.  The

Plaintiff, Alex Holleran (hereinafter "Holleran") filed a response in opposition to the motion on

December 5, 2005, and Omniflight filed a reply brief on December 27, 2005.  For the reasons

discussed in this Order, the motion is GRANTED.

**FACTUAL BACKGROUND**

Alex Holleran filed his Complaint in this case on January 31, 2005, and an Amended

Complaint on February 21, 2005.  Docket at 1 and 7.  In his Amended Complaint, Holleran

asserted claims against Omniflight, a Texas-based corporation, Lutheran Hospital, an Indiana

corporation, and Kevin Wellman, an individual who was employed by Lutheran Hospital.

During the course of the proceedings in this case, the parties have stipulated to the dismissal of

all of Holleran's claims against Lutheran Hospital and Kevin Wellman.  What remains are

Holleran's claims against Omniflight, which include claims of discrimination based on national

origin, brought under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981, and a

claim of retaliatory discharge, also brought under 42 U.S.C. § 1981.[1]  It is those claims that are

the subject of the present motion for summary judgment.

Holleran was born in Iran, although he has lived in the United States since 1985 and has

been a U.S. citizen since 1993.  Amended Complaint, p. 2.  Holleran's birth name (or at least his

previous legal name) was Mohammed Esmail Ahmadirahimabadi, but he changed his name to

Alex Holleran on or about May 1, 2003, in a court proceeding in the State of Hawaii.

Supplement to Defendant's Memorandum in Support of Motion for Summary Judgment,

("Defendant's Supplement"), Docket at 50, pp. 10-11 (Name Change Petition).  Holleran was

employed by Omniflight as a helicopter pilot from May 24, 2004, until he was terminated on

June 14, 2004.  Amended Complaint, p. 3.  According to Holleran, he "satisfactorily performed

his job duties" while employed by Omniflight.  *Id*.  While employed with Omniflight, Holleran

worked as an emergency medical helicopter pilot.  *Id*.  During Holleran's brief tenure with

Omniflight, the company had a contract with Lutheran Hospital to provide emergency medical

helicopter services for the hospital.  *Id*.  As will be more fully discussed below, problems arose

during Holleran's employment with Omniflight and he received a termination letter from the

company on June 14, 2004.  *Id*., p. 4.  About one month after his termination, Holleran filed

charges of discrimination against Omniflight and Lutheran Hospital.  *Id*.  Following the issuance

of a Notice of Right to Sue, Holleran commenced this action.

Holleran maintains that he was an experienced helicopter pilot who always performed his

job well while employed by Omniflight.  *Id*., pp. 2-4.  Omniflight, on the other hand, said that

---

[1]  Holleran had also asserted claims religious discrimination, hostile environment, and
intentional infliction of emotional distress.  Plaintiff and Defendant stipulated to the dismissal of
those claims in October of 2005, leaving the national origin and retaliatory discharge claims.

2

soon after hiring Holleran and assigning him to duties with its customer, Lutheran Hospital, the company received reports from Lutheran that the hospital thought Holleran was an unsafe pilot. Memorandum in Support of Omniflight's Motion for Summary Judgment ("Defendant's Memorandum"), Docket at 44, p. 1.  Omniflight also states that Lutheran requested that Holleran be removed from service with the hospital.  *Id*.  Omniflight maintains that it followed the request of Lutheran and removed Holleran from his position.  *Id*., pp. 1-2.  Also, Omniflight claims that Holleran had expressed to the company his desire to work only in Fort Wayne, Indiana. According to Omniflight, they had no other openings in Fort Wayne at the time Holleran was removed from service under the company's contract with Lutheran, and so the company terminated Holleran's employment altogether (as opposed to transferring him to another location).  *Id*., p. 2.

Holleran alleges that the real reason that Omniflight terminated him was because of his national origin.  He further claims that his discharge was retaliatory and resulted from the fact that he complained to the company about workplace discrimination he had experienced. Amended Complaint, *generally*.

In its motion for summary judgment, Omniflight argues that it is entitled to judgment as a matter of law because "Holleran cannot establish any evidence that the employment actions taken by Omniflight had anything to do with his national origin."  Motion for Summary Judgment, Docket at 43, p. 1.  Omniflight also argues that "Holleran cannot establish that Omniflight retaliated against him.  First, Holleran is barred from bringing his national-origin-retaliation claim under § 1981.  Second, even if he could bring his claim, Holleran cannot establish that he engaged in protected activity or that [there] was a causal connection between his

3

alleged protected activity and his termination." *Id.*

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim.  *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir. 1990).  Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552-53 (1986).  The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2511 (1986).  A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 2512; *In Re Matter of Wildman*, 859 F.2d 553, 557 (7th Cir. 1988); *Klein v. Ryan*, 847 F.2d 368, 374 (7th Cir. 1988); *Valentine v. Joliet Township High School District No. 204*, 802 F.2d 981, 986 (7th Cir. 1986).  No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 322 (7th Cir. 1992) (quoting *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356

(1986)).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2553. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. *Goka v. Bobbitt*, 862 F.2d 646, 649 (7th Cir. 1988); *Guenin v. Sendra Corp.*, 700 F. Supp. 973, 974 (N.D. Ind. 1988); *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.), *cert. denied*, 464 U.S. 960 (1983).

In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. *Anderson*, 477 U.S. at 249-251, 106 S. Ct. at 2511. However, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate. *Mason v. Continental Illinois Nat'l Bank*, 704 F.2d 361, 367 (7th Cir. 1983).

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Id.* 477 U.S. at 248, 106 S. Ct. at 2510. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Id.* The issue of fact must be genuine. Fed. R. Civ. P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to

the material facts." *Matsushita*, 475 U.S. at 586, 106 S. Ct. at 1356; *First National Bank of Cicero v. Lewco Securities Corp.*, 860 F.2d 1407, 1411 (7th Cir. 1988).  The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Id.*  A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-252, 106 S. Ct. at 2512.

## DISCUSSION

### 1.  Title VII Claim for National Origin Discrimination.

A plaintiff asserting a discrimination claim under Title VII must come forth with direct evidence of discrimination or, failing that, proceed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and its long line of progeny. Holleran does not claim to have direct evidence of national origin discrimination.[2]  Rather, he claims that his evidence, viewed in its entirety, creates an inference or fact issue with regard to his discrimination claim.

Under the burden-shifting method of *McDonnell Douglas*, a Title VII plaintiff must first establish a prima facie case of discrimination.  This means he must show that: 1) he belongs to a protected class; 2) he was performing his job in a satisfactory manner; 3) he suffered an adverse employment action; and 4) similarly situated employees not in the protected class were treated more favorably.  *See, e.g., Stone v. City of Indianapolis Public Utilities Div.*, 281 F.3d 640, 644

---

[2] In fact, Holleran concedes that he "lacks direct evidence of national origin discrimination" and must consequently proceed under the indirect method of proof.  Plaintiff's Memorandum in Opposition to Motion for Summary Judgment ("Plaintiff's Memorandum"), Docket at 62, p. 6.

(7th Cir. 2002).  Obviously, Holleran succeeds on the first and third prongs of the prima facie test, and Omniflight concedes that.  But Omniflight adamantly argues that Holleran cannot succeed on the second and fourth points.  The company contends that the evidence clearly demonstrates that Holleran was simply not meeting its reasonable expectations, that it was not feasible to transfer him after relieving him from duty with Lutheran,  and he was terminated for those reasons and those reasons alone.

Assuming a plaintiff can establish a prima facie case of discrimination, the burden then shifts to the defendant employer who must then come forward with a legitimate, nondiscriminatory reason to justify the action it took against the plaintiff.  Finally, once the defendant has articulated a nondiscriminatory reason for its decision, the burden shifts once more to the plaintiff who must present sufficient evidence to cast doubt on that reason.  That is, he must at least raise a fact issue as to whether the defendant's proffered reason is pretextual.  This step is no easy task, since "pretext . . . means a lie, a specifically phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995).  Merely casting doubt on an employer's stated reason for an adverse employment action is not enough to establish that the reason was pretext.  Rather, "to avoid summary judgment, a plaintiff must present evidence showing that the employer did not honestly believe his proffered reason."  *Hague v. Thompson Distribution Company*, 436 F.3d 816, 825 (7th Cir. 2006) (citation omitted).

With regard to the second prong of the burden-shifting method of proof, the Seventh Circuit has observed that where, as here, the second prong of the prima facie case and the question of pretext focus on the same set of circumstances, the case should be scrutinized with respect to the matter of pretext. *Peele v. Country Mutual Ins. Co.*, 288 F.3d 319 (7th Cir. 2002).

However, the Seventh Circuit has also cautioned that the courts should not necessarily "jump" over the prima facie analysis if it appears that the plaintiff cannot sustained his burden of establishing a prima facie case of discrimination in the first place.  In *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177 (7th Cir. 1997), the appellate court explained the so-called "merger" issue this way:

> We do not get to the pretext stage, however, unless the plaintiff gets over the "legitimate expectations" hurdle, and it is here that confusion begins.  The defendant's expectations are not legitimate if they are phony; so if they are argued to be phony, the issue of legitimate expectations and the issue of pretext seem to merge. . . . To [merge the issues] would be contrary to the thinking behind the [burden-shifting] formula.  The formula is best understood as derived from a judgment about what evidence would be sufficient to persuade a rational factfinder that the defendant had discriminated against the plaintiff.  The judgment is that if the noninvidious reason offered by the defendant is not credible, the factfinder can reasonably, although he need not, infer that the real reason was a discriminatory one. . . . This judgment would not make sense without imposing certain preconditions. . . . If [the plaintiff] was not [performing up to the employer's expectations], the inference that he would not have been fired had he not been a member of a protected group is very weak–so weak that the factfinder should not be allowed to speculate on the motive for the termination if all the plaintiff can produce by way of evidence is that he is a member of a protected group . . . .  So in such a case the defendant is not put to the burden of stating the reasons for the plaintiff's termination. . . . If the plaintiff has other evidence of discrimination, well and good; but if he has nothing else, and is therefore totally reliant on the *McDonnell Douglas* formula, he is out of luck if he can't show that he was meeting his employer's legitimate expectations. . . . [s]hould the plaintiff strike out at the first stage by failing to show that he was meeting his employer's bona fide expectations, there is no occasion to go further.

*Coco*, 128 F.3d at 1179 (internal citations omitted).  Thus, even if the facts and evidence underlying a plaintiff's claims go to both a prong of the *McDonnell Douglas* test *and* the issue of pretext, it does not automatically mean that the court should merge those issues and proceed directly to an analysis of the defendant's proffered legitimate reason for an adverse employment action.  Doing so, according to the Seventh Circuit, is akin to putting "'the pretext cart before the

prima facie horse.'" *Herron v. DaimlerChrysler Corporation*, 388 F.3d 293, 300 (7th Cir. 2004)

(quoting *Brummett v. Lee Enters., Inc.*, 284 F.3d 742, 744 (7th Cir. 2002)).  "'We have frequently

warned litigants that the prima facie case must be established and not merely incanted.' . . .

While merger of the legitimate expectations requirement with the pretext analysis is acceptable

in limited circumstances, the obligation to establish a prima facie case should not be disregarded

as a matter of course."  *Id*. (citations omitted).

        This is extremely important in this case.  Omniflight contends that Holleran cannot

establish his prima facie case of national origin discrimination because he failed to meet the

company's legitimate expectations and he cannot show that employees not in the protected class

were treated more favorably.  According to the company, it removed Holleran from his

assignment under the company's service contract with Lutheran Hospital because "Lutheran

Hospital exercised its contractual right to remove him."  Defendant's Memorandum, p. 1.

According to Omniflight, "[b]ecause Lutheran Hospital was dissatisfied with Holleran and his

performance, Holleran was not meeting Omniflight's legitimate expectations."  *Id*, p. 4.

Obviously, if the evidence supports this contention, and the court believes it does, then

Holleran's national origin claim fails as a matter of law.

        Omniflight points out that one of the paramount expectations of its pilots, including of

course Holleran, was to "meet contract requirements" and that Holleran's "job description

indicates that the measure of performance would be 'customer satisfaction.'"  *Id*.  In fact, these

requirements are specifically set out in the Omniflight job description for air medical pilots.

Defendant's Supplement, Docket at 50, pp. 7-8 (Omniflight Helicopters, Inc. Job Description).[3]

That job description form includes the following statement: "Measures of Performance:

Customer satisfaction and safe/compliant operation of the aircraft."  *Id*., p. 8.  Omniflight also

points out that its service contract with Lutheran Hospital contained an express provision

granting to the Hospital the right to have Omniflight remove a pilot if Lutheran determined that

he or she was unacceptable.  *Id*., Docket at 55, p. 19 (Services Agreement).  That provision

reads, in its entirety, as follows:

> 7.1 **General Requirements**.  Each assigned pilot or mechanic shall be acceptable
> to LUTHERAN.  LUTHERAN shall reserve the right to complete a
> background/safety review of each pilot or mechanic prior to their assignment.  All
> personnel are required to conform to duty requirements, program policies and
> procedures, and rules for dress and conduct while on duty.  If, in the opinion of
> LUTHERAN, a pilot or technician does not demonstrate a high degree of aptitude
> for the performance required, including a positive mental attitude and good
> interpersonal relations, [Omniflight] will replace him or her with an acceptable
> pilot or technician with sixty (60) days of written request from LUTHERAN.

*Id.* (emphasis in original).  By way of a letter dated June 14, 2004, Lutheran Hospital informed

Omniflight that it had determined that Holleran was an unacceptable pilot and requested that he

be replaced, pursuant to the provision quoted above.  *Id*., p. 37 (Letter from Lutheran Hospital to

Omniflight).  That letter was written by Kevin Wellman, who worked at Lutheran and held the

---

[3]  Both parties have submitted numerous documents in support of their respective briefs
on the motion for summary judgment.  This court employs an electronic court filing system for
the submission of pleadings and documents to the court.  Documents filed in this manner may
contain exhibit designations placed on them by the parties that differ from the docket number
assigned to them by the court once they are electronically filed.  For ease of reference, the court
will refer to such documents only by their assigned docket number.  Likewise, documents (such
as deposition excerpts) may have page numbers appearing on them that are different from the
page numbers assigned by the court's electronic document filing system.  Again, for ease of
reference, the page numbers referred to in this Order coincide with the page numbers assigned to
documents once they are filed with the court.

title of Coordinator of Critical Care Transport/EMS. *Id*. Omniflight also submitted another

letter, this one undated, which Wellman wrote to Bruce Hamilton, another Lutheran employee

and one of Wellman's superiors. *Id*., p. 38 (Letter from Wellman to Hamilton). In that letter,

Wellman informed Hamilton that he (Wellman) was previously acquainted with Holleran. He

stated that the two men had both worked in air transport service for Parkview Hospital in 2001.

Wellman states that at the time, he was an employee of Parkview working as a paramedic, while

Holleran was an employee of Corporate Jets Aviation, a Pittsburgh-based corporation that

provided air transport service to Parkview. *Id*. Wellman went on to state in that letter that while

he and Holleran worked together at Parkview, Wellman flew in a helicopter piloted by Holleran

and that Wellman had serious concerns about Holleran's abilities as a pilot. *Id*. Wellman stated

in the letter that "[t]o this day, I have concerns for my safety, my fellow crewmembers, and the

integrity of our flight program with the appointment of Mr. Holleran previously know [sic] as

Mr. Ahmadirahim. [sic]" *Id*. Also on June 14, 2004, Colin Henry, the Chief Pilot of Omniflight

and one of the men who originally interviewed and hired Holleran, wrote a termination letter to

Holleran. *Id*., Docket at 50, p. 6 (Letter from Henry to Holleran). In that letter, Henry informed

Holleran that "[t]he reason for termination is based on our customer's request." *Id*. It is

Omniflight's position, then, that Holleran was not fulfilling the company's legitimate

expectations, since his job description listed "customer satisfaction" as a "measure of

performance" and Lutheran had determined that it did not want Holleran serving as a pilot under

its contract. Accordingly, argues Omniflight, Holleran fails to establish a prima facie case of

discrimination and the company is entitled to summary judgment.

11

Holleran, of course, presents a different scenario.  While he does not contest the fact that his job description included a requirement of "customer satisfaction," or the fact that Lutheran asked Omniflight to replace him under its service agreement, he does argue that the reason he was removed from the Lutheran service team in the first place was due to national origin discrimination.

Holleran acknowledges that he and Wellman encountered each other while the two were working for Parkview Hospital.  According to Holleran, "when he first met Wellman, Wellman was standing outside of the crew break room with another flight medic.  When Dan Routt, the chief pilot, introduced Holleran to the men, Wellman refused to shake Holleran's hand, turned to the other medic and said, '[Didn't] Cathy [Harris] said [sic] no blacks or others?'" Plaintiff's Response to Motion for Summary Judgment and Designation of Evidence ("Plaintiff's Response"), Docket at 61, p. 3.  Cathy Harris was Parkview's Director of Flight and EMS.  *Id*. When asked about this incident during his deposition, Holleran recounted it this way:

> A. . . . Kevin Wellman said, so loud that I be able to hear them, intentionally looks like he said that.  He said to Randy, isn't that Cathy Harris code?  That is exactly he said.  Isn't that Cathy Harris said, no black or others?  I didn't get it.
>
> Q.  What are you saying his words were?
>
> A.  Cathy Harris.  Cathy Harris is Director of Operation.
>
> Q.  Right.  And as best you can recall, what was it that Kevin Wellman said?
>
> A.  Kevin Wellman said to Randy, isn't that Cathy–not Cathy Harris.  Isn't that Cathy said no black or others?  I didn't know what that mean.
>
> Q.  Did you ask Kevin Wellman what he meant by that?
>
> A.  No, so–
>
> Q.  Was anything else said?  Did anyone respond to that comment?

. . .

A.  No.

Q.  And did you make any response to that comment?

A.  I am used to it.  No.

*Id*., Attachment 14, (Deposition of Alex Holleran, pp.8-9).  Holleran also states that he experienced other incidences of racist or bigoted remarks while at Parkview.  For example, he claims that at some point in time, Bob Slain, another pilot, "proceeded to tell a racist story/joke, using a funny accent, about an Iranian pilot who could not land his plane and screamed to Allah for help." *Id*., p. 3.  When asked about this incident during his deposition, Holleran testified as follows:

A. . . . Slain with the medic was standing there.  And then he said, oh, you.  I mean, when I actually–I went to the Rochester to fly their helicopter.  . . . We were at the hangar.  I came first time to introduce myself to the people.  I just walked in, after, and then, oh, that, you are the Iranian pilot they were talking about?  I said, yes.  Hi, how are you?  He said, shalom.  I said, shalom.  And then he said, do you remember I was instructor in Iranian Army, and when I gave a rotation to the pilot?  He said he fly the aircraft, he put hand on his head and said, Allah, help me.  I had to hit him and get control from him.  That was example I used for him and many others.

Q.  Backing up a second, is that–who said that to you?

A.  Bob Slain is initiated, and the rest were standing there and laughing and funny, fun.  And I join them, laugh too, so.

*Id.*, (Deposition of Alex Holleran, p. 18).  It is not entirely clear from that testimony exactly what this story or joke meant or was intended to mean.  In any event, Holleran maintains that it was racist in nature.  Again, however, this event took place while Holleran was assigned to fly helicopters for Parkview Hospital, a few years before he began his brief employment with Omniflight.

13

Holleran attempts to link these (and, according to him, a few other) allegedly racist or discriminatory events or remarks to his later termination from Omniflight.  He does so by based on the fact that once he was employed by Omniflight and assigned to Lutheran Hospital, Kevin Wellman was in charge of the Lutheran emergency flight department.  Holleran claims that Wellman "brought the discriminatory 'Parkview attitude' with him to Lutheran."  Plaintiff's Memorandum, p. 2.  Holleran claims that when he first showed up at Lutheran for flight training, he "was met by . . . Kevin Wellman, who told Holleran, 'I know who you are.  You cannot hide [behind] an American name.  You are a threat to security.'" *Id*.  Since Wellman later wrote a letter to one of his superiors at Lutheran expressing his concerns about Holleran's flying abilities, and since Lutheran then asked Omniflight to remove Holleran pursuant to their service agreement, Holleran concludes that the alleged discrimination he experienced at Parkview a few years earlier had reappeared at Lutheran in the form of Kevin Wellman, was essentially transferred, as it were, to Omniflight, and then ultimately resulted in his termination.  All of this even though Holleran admits he never even told anyone at Omniflight about this second comment by Wellman.  On this point, Holleran testified as follows:

> Q.  You indicate on your charge that you never informed anyone of Mr. Wellman's statement regarding threat to security at the time that it was made; is that a fair statement?
>
> A.  That is correct, I didn't say anything.
>
> Q.  Why were you in fear of retaliation for reporting that comment?
>
> A.  First of all, I didn't know Mr. Kevin Wellman had such a power in the Lutheran Hospital, that can hire and fire party.  Second of all, retaliation is, if I tell him, they–I think he is paramedic, that Eric or Omniflight is going to call him and tell him why did you make such a comment?  You cannot harass our pilot, and then he get mad and get provoked and cause more damage.  So, I said like always I do, take it and let it go.

14

Defendant's Supplement, Docket at 48, (Deposition of Alex Holleran, pp. 121-122).

Despite the fact that he never told anyone at Omniflight about Wellman's comment, Holleran still attempts to impute Wellman's alleged prejudicial or racist statements to Omniflight.[4]   Holleran contends that during his initial interview with Omniflight, when he interviewed with both Colin Henry, the Chief Pilot at Omniflight, and Clark Kurschner, the Director of Operations for the company, he informed Henry about the problems he encountered while assigned to work at Parkview.  In this regard, Holleran testified as follows:

> Q.  Now, let me ask you, what was talked about during your interview with Colin [Henry]?
>
> A.  Do you want specific or general?
>
> Q.  Specific.
>
> A.  Specifically, he look at my resume, he, he had–I remember he had a yellow jacket, folder.  He opened it up and put those stuff out, went through it.  And then, um, first thing he caught, he says, flight hours, good. . . . Then when he turn it, he says, who is Mohammed?  I said, that is me.  He said Mohammed is a Muslim name.  I said, we use that to just hide our identity.  So, I did not say exactly I am Muslim.  I said, I am different religion, Armenian, because I thought, so.
>
> Q.  You said you were Armenian?
>
> A.  Armenian Christian, they call Armenian.  So, then after that, he become real different and started asking lots of questions about my background.  And then, he was drilling me mostly on the Parkview Hospital, and I, I, I specifically asked him

---

[4]  Omniflight argues that even if Holleran had informed the company about Wellman's remark concerning Holleran "hiding behind an American name" and being a "threat to security," the comment is not necessarily discriminatory or racist.  According to Omniflight, Wellman could have been merely referring to the fact that Holleran had changed his name since the two crossed paths at Parkview, and that the security threat Wellman was referring to was the threat to safety posed by what Wellman perceived as Holleran's unsafe piloting.  Defendant's Memorandum, p. 3.  Regardless, as Omniflight points out, even if the remark did represent a prejudiced or discriminatory attitude on the part of Wellman, he was never an Omniflight employee and Holleran concedes that he never informed Omniflight about this comment.

several times, do you have anybody from Parkview in the Lutheran Hospital?  He
assured me there is only one person has flown before.  The rest are brand-new
people coming to the program.

. . .

Q.  What did he ask you about your experience at [Parkview]?

A.  He ask me exactly what happened.  So, I had job at that time with Med Trans.
I said, let me spell out then up front, let him know everything.  That I don't want
to get a job and lose that job, too.  So I told him, that is what they said.  I told
him, when I was in a hangar, the pilots, medic was telling me, okay, Alex, what
was your first car or your first girlfriend?  I mean, they said camel was your first
car or first girlfriend?  I just said, well, my first girlfriend and things like that.
This is not a company that can accept people like me.  They don't like people like
me.  If you have somebody from there, better call it off here.  He said, one person
has flown before, the rest are new.

. . .

Q.  Just so I am clear, what did you tell [Colin Henry] in terms of why you left
[Parkview]?

A.  . . . reason for leaving, company practice.  He ask me about that, Mr. Henry
Colin [sic] ask what that mean, company practice.  I said, company practice can
be mistreatment.  They, they make fun of your ethnicity, your religion.  They
don't want you.  They don't want your accent, and the company does not care.  I
put it there, very loud and clear.

Defendant's Supplement, Docket at 46 and 47 (Deposition of Alex Holleran, pp. 38-41).  Thus,

Holleran contends that Omniflight was aware of what Holleran termed the "Parkview attitude,"

and Henry assured him that all the employees working on the company's contract with Lutheran

were new.  Holleran does not dispute the fact that Henry's statement was the truth–that no

former Parkview employees were working for Omniflight on the Lutheran contract.


        In another effort to paint Omniflight (or at least Colin Henry) as prejudiced against him,

Holleran testified about what he perceived as an attitude change on behalf of Henry when, during

Holleran's interview, the issue of Holleran's name change came up. Holleran claims that once

Henry learned that his former name was Mohammed, the tone of the interview changed.

Holleran explained this as follows:

> Q. How did you get notified you were going to be hired?

> A. Actually, Mr. Colin [sic] really didn't want to hire me. Mr. Kurschner hired me.

> Q. How do you know that?

> A. Because after I finish with my, my interview with Mr. Kurschner , he is very good man. He walked me to the door, he was standing behind me. We were both facing to Mr. Colin [sic]. He keep telling Colin, he repeated three times, Henry, I do not have problem with him, do you have? He didn't respond. He said the second time, I don't have problem with him, do you have problem with him? He didn't respond. Looks like his facial expression told Henry Colin [sic] that he wants me, but Henry didn't want me, so.

> Q. Did–are those the words they used precisely as you can recall?

> A. That is exactly what he said, three times. Then Mr. Colin [sic] said, let's talk dollars.

> . . .

> Q. And what was said after this statement, I don't have a problem with him, do you, and there was no response from Colin? When did Colin say, let's talk money?

> A. He said, okay, it was fine. Okay, and then he say, I invite you to finish things. And then he said, come in, and let's talk dollar.

> Q. Who said okay?

> A. Mr. Colin Henry.

> Q. Colin Henry?

> A. Colin Henry.

> Q. And so, who did you talk dollars with?

A.  Mr. Henry.

*Id*., pp. 43-45.  What this meant, according to Holleran, was that "when Henry saw Holleran's former Muslim name, Henry's attitude towards Holleran changed: 'His tone, his friendship changed.  The way he was relaxed with me before he [saw] that.  Everything was going good.  Henry said, I am glad you are here, and then after he saw that name . . . he was not interested in my stories.'" Plaintiff's Response, Docket at 61, p. 9 (quoting excerpts of the Deposition of Alex Holleran).

Holleran's own testimony reveals two important undisputed facts.  First, that employees of Parkview–*not* Omniflight--expressed what he concluded were racist, discriminatory, or bigoted attitudes.  Second, that Holleran alerted Omniflight about these concerns during his interview with the company.  But by revealing these facts, Holleran also makes clear, at the same time, two other points which seriously undermine his claim that he was discriminated against by Omniflight.  First, the arguably discriminatory and/or prejudicial comments and treatment he experienced were the result of the words or actions of Parkview, not Omniflight, employees.  Second, Omniflight hired Holleran knowing full well that he was of Middle Eastern ancestry.  (Not only that, they hired him knowing he was obviously sensitive to remarks that could be construed as intolerant of individuals with his national origin.)  Despite this, he persists in his argument that his termination from Omniflight was the result of national origin discrimination.

But Holleran's testimony regarding Wellman's alleged prejudice (or, as he puts it, the "Parkview attitude") is not proof of discrimination by Omniflight.  Assuming Holleran's recollection of the facts is accurate, his testimony reveals that at least a few people at Parkview

18

may have harbored prejudice against people of Middle Eastern descent.  (This assumes, of course, that the jokes and comments were the products of prejudice rather than just sophomoric and insensitive attempts at humor.)  And his testimony regarding a supposed change in Henry's attitude once Henry learned that Holleran's former name was Mohammed is based on nothing but his own speculation.  This appears especially obvious given the fact that Henry and Kurschner hired Holleran.  The fact that Holleran experienced what he concludes is a discriminatory attitude while working at Parkview, and that he told Henry about this experience during his interview with Omniflight, does not serve to lay that same attitude at the feet of Henry or Kurschner.

It is not entirely clear from the record whether Henry had any knowledge that Wellman was working at Lutheran.  However, even if he did, Wellman was not an Omniflight employee and therefore was not subject to Omniflight's control.  The mere fact that Wellman repeated a comment ("no blacks or others") allegedly made by yet another Parkview employee, Ms. Harris, which arguably could constitute evidence of a discriminatory attitude on her part, demonstrates absolutely nothing with respect to Omniflight.  This would be true even if Henry was fully aware that Wellman had taken a job at Lutheran.  As Omniflight puts it, "the mere references by Holleran that he believed he was discriminated against in his last job does not put Omniflight on notice of discrimination that it could correct."  Defendant's Reply, p. 11.

It is well established that "self-serving speculations and conclusions are not enough to survive summary judgment."  *Roszkowiak v. Baxter Healthcare Corp.*, 1998 WL 422284 (N.D. Ill.).  "'[M]ere speculation as to the thoughts of the decision maker is irrelevant to an inquiry of discrimination.'" *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1062 (7th cir. 2003) (quoting *O'Regan v.*

*Arbitration Forums, Inc.*, 246 F.3d 975, 986 (7th cir. 2001)).  *See also, Rothman v. Emory University*, 123 F.3d 446, 453 (7th Cir. 1997) (a plaintiff's perceptions of an employer's motivations are ineffectual means of proving discrimination).

In this case, all that Holleran offers in support of his national origin discrimination claim against Omniflight is speculation and conclusion.  He concludes that the comments and behavior to which he was subjected while working at Parkview constituted discrimination based on his national origin.  He then assumes that because he told Henry about these experiences during his interview with Omniflight, Omniflight was somehow "on notice" that this discrimination could rear its ugly head again at Lutheran.  Next Holleran speculates that Wellman's (and therefore Lutheran's) request that Omniflight remove him from his service at the hospital was also the result of Wellman's discriminatory attitude rather than a legitimate concern about Holleran's abilities as a pilot.  He bases this conclusion on Wellman's remark that Holleran could not "hide behind an American name" and was a "threat to security."  It is not difficult to understand why Holleran interpreted this comment to refer to his national origin rather than his flying ability.  The problem is, Holleran admits that he never informed anyone at Omniflight about this remark.  Still, he takes the next leap of faith and speculates, yet again, that Omniflight was lying when it said he was being terminated at its customer's request.

Holleran presents evidence that no one at Omniflight expressed any concern or reservation about his flying abilities.  He also presents the testimony of employees of both Parkview and Lutheran who stated that they flew with Holleran and had no reason to question his abilities as a pilot.  This, he contends, refutes Wellman's allegations.  Plaintiff's Memorandum, Docket at 62, pp. 7-8.  However, as Omniflight correctly argues in rebuttal, this is

20

of little or no relevance, since Holleran was terminated at the request of the customer, pursuant to contractual terms, and not because Omniflight itself had suddenly expressed any concerns or doubts about his abilities as a pilot.  Defendant's Reply, p. 3.  As Omniflight expresses it, "Holleran was terminated for failing to meet customer satisfaction, and any evidence that he was flying 'fine' does not address Omniflight's customer satisfaction concerns."  *Id*.

An employer's honest belief that an employee (among other faults) has poor customer relations skills has a legitimate complaint that the employee is not performing to the company's satisfaction.  *See, e.g., Olsen v. Marshall & Ilsey Corp.*, 267 F.3d 597, 603 (7th Cir. 2001). Furthermore, even if Holleran is correct and his flying abilities were truly in question, the fact that an employee is meeting the minimum requirements of his or her job does not automatically mean that he is meeting the legitimate expectations of his employer.  *Robin v. Espo Engineering Corp.*, 200 F.3d 1081, 1090 (7th Cir. 2000).  As long as an employer's expectations of employee performance are "'in good faith, without fraud or deceit,' [the court will] only determine if the employee met them."  *Id*. (internal citation omitted).  In the present case, Omniflight claims it was merely adhering to Lutheran's request, which was lodged pursuant to the terms of the contract between the two companies, that Holleran be removed as an EMS pilot.  And the evidence supports that.  *See also, Anderson v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d 470 (7th Cir. 2001) (employer did not discriminate against employee on the basis of her religion by preventing her from using the phrase "Blessed Day" once customer complained that it was inappropriate).

Even assuming that all of the facts as presented by Holleran are true–Wellman was prejudiced against him, Holleran's skills as a pilot were above reproach, and the "Parkview

attitude" to which he was subjected appeared again at Lutheran–they do not establish that he was performing up to Omniflight's legitimate expectations once Lutheran requested (rightly or wrongly) that he be removed from service at the hospital.  Holleran may indeed have been a victim of discrimination at Parkview and/or Lutheran (at least in the generic sense if not the legal sense), but that does not mean that Omniflight discriminated against him by terminating him pursuant to its customer's written request.  There is quite a difference between an employee who is the victim of unfairness in the workplace and one who is the victim of illegal discrimination.

Omniflight also argues that Holleran fails to overcome what has become known as the "common actor" inference.  According to Omniflight, "Holleran does not deny that both Kurschner and Henry interviewed him, asked him questions, and even had the authority to make the employment decision. . . . Holleran does not deny that Henry discussed the terms and conditions of Holleran's employment with him. . . . Yet despite all of this and the direct testimony by both Kurschner and Henry that they jointly made the employment decision, Holleran wants this Court to believe, based solely on Holleran's speculation, that Kurschner was the lone-decision maker regarding his hire."  Defendant's Reply, p. 8.  Kurschner and Henry also both testified that they jointly made the decision to terminate Holleran following Lutheran's written request.  *See* Defendant's Supplement, Docket at 51 (Deposition of Colin Henry, p. 10); Plaintiff's Designation of Evidence, Docket at 61, (Deposition of Clark Kurschner, p. 5). Nonetheless, Holleran tries to deflect this issue by claiming that Henry somehow changed his mind about hiring him once it came to light in their interview that Holleran's previous name was Mohammed, and that it was actually Kurschner who ended up hiring him.  Holleran's logic is that since he believed that Henry didn't really want to hire him and Kurschner did, but then

22

Henry was the one who actually told him he was terminated, there is therefore no "common actor" inference. This is another huge jump in logic. Holleran's reasoning on this point turns the "common actor" inference into a sort of conundrum.

Holleran cannot escape the legal presumption that arises out of the "common actor" scenario merely by speculating and concluding that Henry's "attitude" had somehow changed during the interview process. The "common actor" inference is based on the "common-sense psychological assumption" that "[i]t hardly makes sense to hire workers from a group one dislikes . . . only to fire them once they are on the job." *See also, Roberts v. Separators, Inc.*, 172 F.3d 448, 453 (7th Cir. 1999); *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 744 (7th Cir. 1999). *Chiaramonte v. Fashion Bed Group*, 129 F.3d 391, 399 (7th Cir.1997); *EEOC v. Our Lady of the Resurrection Med. Ctr.*, 77 F.3d 145, 152 (7th Cir.1996). This presumption is rebuttable. *Johnson*, 172 F.3d at 453. However, as discussed above, Holleran's "evidence" on this point consists entirely of his own speculation (which is, in turn, based on his own subjective interpretation of Henry's mood or demeanor during their interview).

Much, perhaps most, of the court's discussion in this order with regard to Omniflight's stated reason for terminating Holleran, including the discussion of the "common actor" presumption, would appear to go to the heart of the issue of pretext. Indeed, if it were necessary for the court to address the issue of pretext, the discussion and analysis herein would not change dramatically. The point at which the discussion of the second prong of the prima facie case and the issue of pretext merge is not always clearly delineated. But in this instance, when the analysis of the facts are applied to the requirements of a prima facie case, Holleran fails to establish that he was performing to the reasonable expectations of Omniflight. Lutheran wanted

him out and Omniflight complied with its customer's request.  Whether that request by Lutheran

was based on fact, speculation, or even outright prejudice on the part of Wellman is,

unfortunately for Holleran, not relevant to the inquiry.

Holleran also fails to present sufficient evidence to establish the fourth prong of the

prima facie case–that other employees not in the protected class were treated more favorably

than he.  Omniflight claims that it "terminated only four other line pilots based upon a

customer's request . . . . While all of these employees are from the United States, none of these

employees was relocated after being removed from the customer."  Defendant's Memorandum,

p. 5 (citing Omniflight's Answers to Plaintiff's Second Set of Interrogatories).  Holleran alleges,

however, that Omniflight did offer relocation to other employees.  In support of this contention,

Holleran cites a portion of the deposition testimony of Clark Kurschner.  Kurschner's testimony

on this point is somewhat vague, but it does imply (or at least one could infer) that the company

attempted to relocate other employees at some point in the past.  *See* Defendant's Reply, pp. 4-5.

Kurschner's testimony on this point, however, does not refer to the national origin of these

employees or whether they were pilots or other types of employees.  Plaintiff's Response,

Docket at 61, Attachment 15 (Deposition of Clark Kurschner, pp. 5-8).  He does refer to one

pilot who worked in the Columbus, Ohio, area and who was apparently transferred to another

base (apparently in that same area) following some sort of dispute with a customer or a

customer's employee.  *Id*.  However, Kurschner further testified that the transfer of that pilot

ultimately "didn't work" and that Omniflight was ultimately "requested to remove the pilot."  *Id*.

He then testified that Omniflight sometimes offered in-house job openings "in other parts of the

country," but that no employee ever accepted one of those openings.  *Id.*  He did not state (nor

24

does it appear that he was asked) whether any of those job openings were ever offered to non-Iranian (or at least non-minority) pilots who were removed from a job following a customer's request. Thus, Omniflight maintains that the only other pilots ever removed pursuant to a customer's request were not relocated, and so were not treated more favorably than Holleran.

Holleran attempts to establish that other pilots were treated more favorably by first claiming that "Omniflight neglected to inform the court that offers of relocation *were* made to several non-Iranian pilots, including one from Ohio." Plaintiff's Memorandum, p. 8 (italics in original). Holleran argues that Kurschner's testimony contradicts the company's answers to his second set of interrogatories, in which, as mentioned above, the company claimed that only four other pilots were removed at the request of customers and that none of them were offered relocation or transfer. *Id*. Omniflight counters that this statement misrepresents the evidence and the testimony of Kurschner. Omniflight argues that Kurschner's testimony only confirms that one pilot–the one in Ohio–was transferred to another base after a dispute with a customer's employee and later was terminated upon the customer's request. The rest of Kurschner's testimony, argues Omniflight, only reveals that the company posted in-house openings in other parts of the country and no employees–pilots or others–accepted any of those positions. Omniflight reiterated, in an affidavit by Kurschner, that "Omniflight has terminated five pilots upon a customer's request," including Holleran, and that "[n]one of these pilots was relocated to another customer, and all of these pilots were designated as ineligible for rehire." Defendant's Supplement, Docket at 57, Affidavit of Clark Kurschner. Therefore, despite the interpretation Holleran places on Kurschner's testimony, the evidence supports the company's position that four other, non-minority pilots were removed from service at the request of customers and none

25

of them were relocated or given other positions within the company.  Therefore, Holleran fails to present evidence that other pilots who were similarly situated were treated more favorably.

For these reasons, Holleran  has failed to establish a prima facie case of discrimination on the basis of national origin and therefore his claim can proceed no further.

### 2.  Discrimination Claim Pursuant to 42 U.S.C. § 1981.

Holleran has also asserted a claim against Omniflight under 42 U.S.C. § 1981.  Amended Complaint, Docket at 7, p. 5.  Under § 1981, "all persons within the jurisdiction of the United States shall have the same right . . . to the full and equal benefit of all laws . . . as is enjoyed by white citizens."  42 U.S.C. § 1981.  Omniflight argues that Holleran cannot maintain a claim under § 1981 for national origin discrimination since it applies only to race discrimination, and the courts have distinguished between the two causes of action.  Defendant's Memorandum, Docket at 44, p. 9 (citing *Abdulrahim v. Gene B. Glick Co.*, 612 F.Supp. 256 (N.D. Ind. 1985) and *Torrespico v. Columbia College*, 1998 WL 703450 (N.D. Ill. 1998)).  Holleran counters by stating that in his Amended Complaint he proclaimed that he was "born in Iran" and is "of Iranian descent."  Plaintiff's Memorandum, Docket at 62, p. 4.  Then Holleran cites the case of *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 107 S.Ct. 2002 (1987) in support of his argument that the meanings of the terms "race," and "ancestry" (or national origin) are essentially indistinguishable, at least as far as the protections afforded by § 1981 are concerned.  But the court need not resolve this (largely semantical dispute) between the parties.  That is because "Title VII and § 1981 discrimination claims are analyzed in the same manner . . . ." *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 337-38 (7th Cir. 2002).  That is, under either statute, a plaintiff must present either direct or indirect evidence of discrimination and must

establish a prima facie case in order to preclude summary judgment in favor of the employer. *Id.* *See also, Hague v. Thompson Distribution Company*, 436 F.3d 816, 820 (7th Cir. 2006). Since a discrimination claim under § 1981 is analyzed exactly as a discrimination claim under Title VII, and since Holleran cannot establish a prima facie case of discrimination, it does not matter what statute he cites as a basis for his claim. Accordingly, Holleran's claim of national origin discrimination pursuant to 42 U.S.C. § 1981 also fails to survive Omniflight's motion for summary judgment.

### 3. Retaliatory Discharge Claim.

Finally, Holleran asserted a claim for retaliation, claiming he was terminated by Omniflight as a result of having complained about discrimination. Amended Complaint, p. 6. But yet again, "[a]s with other employment-related claims (discrimination for instance), a plaintiff may proceed with a claim of retaliation pursuant to either the direct or indirect method." *Isbell v. Allstate Insurance Company*, 418 F.3d 788, 793 (7th Cir. 2005). Since Holleran does not claim to have any direct evidence of retaliation, he must proceed once again under the indirect method. This requires him to establish that "'(1) [he] engaged in statutorily protected activity; (2) [he] was performing [his] job according to [his employer's] legitimate expectations; (3) despite [his] satisfactory performance, [he] suffered an adverse employment action; and (4) [he] was treated less favorably than similarly situated employees who did not engage in statutorily protected activity.'" *Id.* (quoting *Luckie v. Ameritech Corp.*, 389 F.3d 708, 714 (7th Cir. 2004)).

With regard to this claim, Holleran even more clearly fails to establish a prima facie case. First, the only possible protected activity he can claim to have engaged in is complaining to

27

Colin Henry, during his initial interview, about what he experienced while working at Parkview several years earlier.  Holleran has admitted that he never told anyone at Omniflight about Wellman's alleged comment about "hiding behind an American name" and being a "threat to security."  In short, the only complaints Holleran ever made to his employer, Omniflight, that could be interpreted as complaints about discrimination were those having to do with the mistreatment he felt he was subjected to at Parkview, several years before he was hired by Omniflight.  But this had nothing whatsoever to do with Omniflight.  Also, for all the reasons already discussed above, Holleran has failed to establish that he was "performing his job according to [his employer's] legitimate expectations."  Thus, he fails to establish a prima facie case of retaliation against Omniflight.

## CONCLUSION

For the reasons discussed herein, the Motion for Summary Judgment filed by Defendant Omniflight Helicopters, Inc., is GRANTED.


Dated: March 22, 2006


                                                       /s/   William C. Lee
                                                      William C. Lee, Judge
                                                      United States District Court
                                                      Northern District of Indiana

28